# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 23, 2012

Lyle W. Cayce
Clerk

No. 09-60406

JANE DOE, A Minor, By and Through Her Next Friends, Daniel Magee and
Geneva Magee; DANIEL MAGEE, Individually and on Behalf of Jane Doe;
GENEVA MAGEE, Individually and on Behalf of Jane Doe, A Minor,

Plaintiffs–Appellants

v.

COVINGTON COUNTY SCHOOL DISTRICT, by and through its Board of
Education and its President, Andrew Keys and its Superintendent of
Education, I.S. Sanford, Jr.; COVINGTON COUNTY SUPERINTENDENT
OF EDUCATION, I.S. SANFORD, Officially and in His Individual Capacity;
COVINGTON COUNTY BOARD OF EDUCATION, By and Through its
President, Andrew Keys; ANDREW KEYS, Officially and in His Individual
Capacity; TOMMY KEYES; OTHER UNKNOWN JOHN DOE AND JANE
DOE EDUCATION DEFENDANTS A-Z, In Their Official and Individual
Capacities,

Defendants–Appellees

Appeal from the United States District Court
for the Southern District of Mississippi

Before JONES, Chief Judge, and KING, JOLLY, DAVIS, SMITH, WIENER,
GARZA, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO, OWEN,
ELROD, SOUTHWICK, HAYNES, GRAVES, and HIGGINSON, Circuit Judges.

KING, Circuit Judge, joined by EDITH H. JONES, Chief Judge, E. GRADY
JOLLY, W. EUGENE DAVIS, JERRY E. SMITH, EMILIO M. GARZA,

No. 09-60406

BENAVIDES, CARL E. STEWART, EDITH BROWN CLEMENT, PRADO, OWEN, JENNIFER WALKER ELROD, LESLIE H. SOUTHWICK, HAYNES, and GRAVES, Circuit Judges:

For the third time, the en banc court is called upon to decide whether a public school student has stated a constitutional claim against her school for its failure to protect her from harm inflicted by a private actor. Relying on our prior en banc opinions, the district court found that she had failed to state a claim and dismissed her complaint. A panel of this court reversed in part, concluding that the student had a special relationship with her school under *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), and that the school was therefore constitutionally obligated to protect her from acts of private violence. The panel nevertheless granted qualified immunity to those defendants sued in their individual capacities. We granted rehearing en banc, thereby vacating the panel opinion. We now hold that the student did not have a *DeShaney* special relationship with her school, and her school therefore had no constitutional duty to protect her from harm inflicted by a private actor. We also hold that the student has failed to state a claim under the state-created danger theory or under a municipal liability theory. We therefore affirm the judgment of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

During the 2007-2008 school year, Jane Doe ("Jane") attended an elementary school in Covington County, Mississippi. She was nine years old at the time. At some point during the school year, Jane's guardians filled out a "Permission to Check-Out Form," on which they listed the names of the individuals with exclusive permission to "check out" Jane from school during the school day. On six separate occasions between September 2007 and January

No. 09-60406

2008,[1] school employees allowed a man named Tommy Keyes ("Keyes"), who allegedly bore no relation to Jane and was not listed on her check-out form, to take Jane from school. On these occasions, Keyes took Jane from school without the knowledge or consent of her parents or guardians, sexually molested her, and subsequently returned her to school. On the first five occasions, Keyes signed out Jane as her father. On the final occasion, he signed her out as her mother. The complaint alleges that Keyes was able to gain access to Jane because the policy promulgated by the various school officials permitted school employees to release Jane to Keyes without first verifying Keyes's identification or whether he was among those people listed on her  "Permission to Check-Out Form." The complaint contends that this policy created a danger to students and the implementation and execution of the policy constituted deliberate indifference towards the rights and safety of those students, including Jane. This policy is alleged to be the direct and proximate cause of Jane's injury.

The complaint thus assigns a passive role to school employees, alleging that the school violated Jane's constitutional rights by "*allowing* the Defendant, Tommy Keyes, to check the minor child out from school" without verifying his identity or his authorization to take the child. It also alleges that the school policy *permitted* school employees to release students to individuals without checking their identification or authorization, but did not *require* them to do so. The policy thus delegated to school employees the discretion to release a student without verifying an adult's identity or his authorization. Furthermore, the complaint does not claim that any school employee had actual knowledge that Keyes was not authorized to take Jane from school, only that the employees did not check Keyes's identification or verify that he was among the adults listed on Jane's check-out form.

---

[1] The incidents occurred on September 12, September 27, October 12, November 6, December 11, 2007, and January 8, 2008.

3

No. 09-60406

Jane, her father, and her paternal grandmother (together, the "Does") sued the Covington County School District; the Covington County Superintendent of Education, I.S. Sanford, Jr., in his official and individual capacities; the Covington County School Board; and the President of the Covington County School Board, Andrew Keys, in his official and individual capacities (together, "Education Defendants"). The Does also named Keyes and other unnamed education defendants in their official and individual capacities. The Does asserted due process and equal protection claims under 42 U.S.C. §§ 1983, 1985, and 1986,[2] as well as various state law causes of action.

On the Education Defendants' motion, the district court dismissed the Does' federal claims for failure to state a claim and declined to exercise supplemental jurisdiction over the remaining state law claims. The court concluded that under the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), Jane had no constitutional right to be protected from harm inflicted by a private actor such as Keyes except under one of two narrow exceptions—the "state-created danger" theory and the "special relationship" exception. The district court assumed that the state-created danger theory was available in this circuit, but held that the Does had not sufficiently pleaded a due process violation based on that theory. The court thus determined that the "primary question" was whether the Does could state a claim based on a special relationship between Jane and the

---

[2] As discussed further herein, the limited right to state protection from private violence arises out of the substantive due process component of the Fourteenth Amendment, not equal protection or procedural due process. *See DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 200 (1989) ("In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf . . . which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . ."); *Walton v. Alexander*, 44 F.3d 1297, 1302-03 (5th Cir. 1995) (en banc). We therefore analyze Jane's cause of action as a substantive due process claim.

No. 09-60406

Education Defendants, and concluded that the claim was foreclosed by our precedent.

On appeal, a majority of a panel of this court reversed the district court's judgment in part. The majority found that the Does had pleaded a facially plausible claim that the school had violated Jane's substantive due process rights by virtue of its special relationship with her and its deliberate indifference to known threats to her safety. *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Bd. of Educ.*, 649 F.3d 335, 353-54 (5th Cir. 2011). The panel majority, however, affirmed the district court's qualified-immunity dismissal of Jane's constitutional claim against those Education Defendants sued in their individual capacities. *Id.* We ordered rehearing en banc. *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Bd. of Educ.*, 659 F.3d 358 (5th Cir. 2011). For the reasons set forth herein, we now affirm the judgment of the district court.

## II. STANDARD OF REVIEW

We review a district court's dismissal under Rule 12(b)(6) de novo, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citation and internal quotation marks omitted). To survive dismissal pursuant to Rule 12(b)(6), plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133 (5th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). Our task, then, is "to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the

5

No. 09-60406

plaintiff's likelihood of success." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Iqbal*, 129 S. Ct. at 1949).

## III. DISCUSSION

To state a claim under 42 U.S.C. § 1983, "a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (citation and internal quotation marks omitted). The central issue here is whether the Does have in fact alleged the violation of a constitutional right. Because we find that they have not, we affirm the district court's dismissal of this case.

### A.    *DeShaney* **Special Relationship**

Jane's constitutional claim against the Education Defendants is based not upon Keyes's molestation of Jane, but rather upon the school's allegedly deficient check-out policy, which allowed the molestation to occur.[3] Jane's constitutional claim can proceed, therefore, only if the Education Defendants had a constitutional duty to protect Jane from non-state actors. This duty, in turn, may exist if there is a special relationship, as contemplated by *DeShaney*, between Jane and her school. *See Walton v. Alexander*, 44 F.3d 1297, 1300-01 (5th Cir. 1995) (en banc). We begin by reviewing *DeShaney* and its progeny, then consider the application of this law in the context of this case.

---

[3] Jane does not, and indeed cannot, state a substantive due process claim based upon the sexual molestation itself. Although we recognized a constitutional right to bodily integrity in *Doe v. Taylor Independent School District*, 15 F.3d 443 (5th Cir. 1994) (en banc), we found that this right is "necessarily violated when a *state actor* sexually abuses a schoolchild and that such misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment." *Id.* at 451-52 (emphasis added). *Taylor* is inapplicable here because the actual violation of Jane's bodily integrity was caused by Keyes, a non-state actor.

No. 09-60406

1.    DeShaney *Recognizes a Limited Duty to Protect*

*DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), arose out of the tragic case of young Joshua DeShaney, who had been placed in state custody after the Winnebago County Department of Social Services suspected his father of child abuse. The agency subsequently returned Joshua to his home after finding insufficient evidence of abuse. Once at home, Joshua continued to endure beatings from his father, and was ultimately left with severe brain damage. *Id.* at 191-93. Joshua DeShaney and his mother sued the Winnebago County Department of Social Services and various individual defendants, alleging that the Department and its employees had violated Joshua's substantive due process right by failing to protect him from his father's violence even though they knew that he faced a very real danger of harm. *Id.* at 193. The Supreme Court rejected this claim, and held that the plaintiffs could not maintain an action under § 1983 because there had been no constitutional violation. *Id.* at 202. The Court noted that the Fourteenth Amendment was enacted to "protect the people from the State, not to ensure that the State protect[] them from each other." *Id.* at 196. The Due Process Clause, the Court explained, "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* at 195. Thus, the Court concluded that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

The Court noted that this categorical rule is subject to at least one very limited exception.[4] Under this exception, a state may create a "special relationship" with a particular citizen, requiring the state to protect him from

---

[4] Several courts of appeals have recognized a second limited exception, the so-called "state-created danger" theory. We address this theory below.

7

harm, "when the State takes a person into its custody and holds him there against his will." *Id.* at 199-200. In such instances, "the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 200. That special relationship exists when the state incarcerates a prisoner, *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976), or involuntarily commits someone to an institution, *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982). The *DeShaney* Court reasoned that:

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney*, 489 U.S. at 200. The Court stated that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.*

In addition to the circumstances of incarceration and involuntary institutionalization recognized by the Court in *DeShaney*, we have extended the special relationship exception to the placement of children in foster care. *Griffith v. Johnston*, 899 F.2d 1427, 1439 (5th Cir. 1990). We reasoned that the state assumes a constitutional duty to care for children under state supervision because "the state's duty to provide services stems from the limitation which the state has placed on the individual's ability to act on his own behalf." *Id*. We have not extended the *DeShaney* special relationship exception beyond these three situations, and have explicitly held that the state does *not* create a special relationship with children attending public schools.

2.      *Schools and the Special Relationship Exception in the Fifth Circuit*

We have twice considered en banc whether the special relationship exception to the *DeShaney* rule applies in the context of public schools. *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412 (5th Cir. 1997) (en banc); *Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995) (en banc). In both cases, we concluded that a public school does not have a special relationship with a student that would require the school to protect the student from harm at the hands of a private actor.

In *Walton v. Alexander*, the student plaintiff attended the Mississippi School for the Deaf, a residential public school, and was sexually assaulted by a fellow student. 44 F.3d at 1299. The student plaintiff brought suit under § 1983, based upon the special relationship exception. Even though the school was a residential school, and thus responsible for fulfilling most of the students' day-to-day needs, we held that the school had not created a special relationship with the student, because the student "attended [the] school voluntarily with the option of leaving at will." *Id.* at 1305. In so holding, we "strictly" construed *DeShaney* and explained that it is "important to apply *DeShaney* as it is written." *Id.* at 1303, 1305. We reasoned, "*DeShaney* emphasize[d] . . . that extending the Due Process Clause to impose on the state the obligation to defend and to pay for the acts of non-state third parties is a burden not supported by the text or history of the Clause, nor by general principles of constitutional jurisprudence." *Id.* at 1305. We concluded that "[s]uch an expansion of the state's liability for acts of third parties only can make constitutional sense . . . when the state has effectively taken the plaintiff's liberty under terms that provide no realistic means of voluntarily terminating the state's custody *and* which thus deprives the plaintiff of the ability or opportunity to provide for his own care and safety." *Id.* (emphasis in original). It is only under these "extreme circumstances that the state itself, by its affirmative act and pursuant to its own will, has

effectively used its power to force a 'special relationship,' with respect to which it assumes a certain liability." *Id.*

We next addressed the special relationship exception in *Doe v. Hillsboro Independent School District*, where we likewise held that the exception did not apply in the context of a public school. 113 F.3d at 1415. The student plaintiff in that case was thirteen years old. She was "kept after school to do special work on her studies" and was sexually assaulted by a custodian (who was not alleged to have been acting under color of state law) when she was sent to an unoccupied area of the school to retrieve supplies for her teacher. *Id.* at 1414. We rejected the plaintiff's argument that a special relationship existed between the school and the student due to the fact that school attendance was required by state law, and declined "to hold that compulsory attendance laws alone create a special relationship giving rise to a constitutionally rooted duty of school officials to protect students from private actors." *Id.* at 1415. We reasoned that "[t]he restrictions imposed by attendance laws upon students and their parents are not analogous to the restraints of prisons and mental institutions" because "[t]he custody is intermittent," "the student returns home each day," and "[p]arents remain the primary source for the basic needs of their children." *Id.*

Numerous panel decisions have declined to recognize a special relationship between a public school and its students. *See, e.g.*, *Doe v. San Antonio Indep. Sch. Dist.*, 197 F. App'x 296, 298-301 (5th Cir. 2006) (finding no special relationship between a school and a fourteen-year-old special education student when the student was allowed to leave with her "uncle," who later allegedly molested her); *Teague v. Tex. City Indep. Sch. Dist.*, 185 F. App'x 355, 357 (5th Cir. 2006) (finding no special relationship between a school and an eighteen-year-old special education student who was sexually assaulted by another special education student); *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 199, 202-03 (5th Cir. 1994) (finding no special relationship between a high school and

No. 09-60406

a student shot and killed in the school hallway during the school day by a boy who was not a student but had gained access to the school); *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 522, 529 (5th Cir. 1994) (finding no special relationship between a high school and a student fatally wounded by a gunshot fired in the school parking lot after a school dance).

We reaffirm, then, decades of binding precedent: a public school does not have a *DeShaney* special relationship with its students requiring the school to ensure the students' safety from private actors. Public schools do not take students into custody and hold them there against their will in the same way that a state takes prisoners, involuntarily committed mental health patients, and foster children into its custody. *See DeShaney*, 489 U.S. at 199-200; *Griffith*, 899 F.2d at 1439. Without a special relationship, a public school has no *constitutional* duty to ensure that its students are safe from private violence. That is not to say that schools have absolutely no duty to ensure that students are safe during the school day. Schools may have such a duty by virtue of a state's tort or other laws. However, "[s]ection 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker v. McCollan*, 443 U.S. 137, 146 (1979).

Like our court, each circuit to have addressed the issue has concluded that public schools do not have a special relationship with their students, as public schools do not place the same restraints on students' liberty as do prisons and state mental health institutions. *See, e.g.*, *Hasenfus v. LaJeunesse*, 175 F.3d 68, 69-72 (1st Cir. 1999) (fourteen-year-old student attempted suicide after being sent unsupervised to a locker room); *D.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1366, 1370-73 (3d Cir. 1992) (en banc) (sixteen-year-old student was sexually assaulted by fellow students in a unisex bathroom and darkroom, both of which were part of a classroom where a teacher was present during the attacks); *Stevenson ex rel. Stevenson v. Martin Cnty. Bd. of*

11

*Educ.*, 3 F. App'x 25, 27, 30-31 (4th Cir. 2001) (ten-year-old student assaulted by his classmates); *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 500-01, 509-10 (6th Cir. 1996) (fourteen-year-old student sexually assaulted by an athletic coach off school grounds); *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 268, 272-73 (7th Cir. 1990) (teacher sexually molested two "school-age children"); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 731-34 (8th Cir. 1993) (intellectually disabled high school boy was sexually assaulted by another intellectually disabled student); *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 968-69, 972-74 (9th Cir. 2011) (developmentally disabled high school student was sexually assaulted by a classmate when she was permitted to use restroom alone even though her parents specifically requested that she be under adult supervision at all times due to her disability); *Maldonado v. Josey*, 975 F.2d 727, 728, 729-33 (10th Cir. 1992) (eleven-year-old boy died of accidental strangulation in an unsupervised cloakroom adjacent to his classroom during the school day); *Wyke v. Polk Cnty. Sch. Bd.*, 129 F.3d 560, 563, 568-70 (11th Cir. 1997) (thirteen-year-old boy committed suicide a few days after unsuccessful attempts at school and school officials never told his mother of the attempts).

3.    *No Special Relationship Exists Here*

Against this backdrop, and the many decisions to the contrary, the Does (together with our dissenting colleagues) argue that Jane had a special relationship with her school, and therefore a substantive due process interest. They contend that compulsory school attendance laws, combined with Jane's young age and the affirmative act of placing Jane into Keyes's custody (what the Does describe as the Education Defendants' "active, deliberatively indifferent, conduct"), created a special relationship in this case. None of these factors, however, provides a basis to conclude that the school assumed a constitutional duty to protect Jane. Instead, the Does' argument ignores the contours of the special relationship exception to create a cause of action where none exists.

No. 09-60406

a.    *Jane's Young Age*

The Does (and the dissenters) rely largely upon Jane's young age to distinguish this case from the many others in which we have held that schools have no special relationship with their students. We do not find Jane's age to be a relevant distinguishing characteristic for purposes of the special relationship analysis.[5]

Although it is true that in our prior cases we have dealt with children older than Jane, we have never relied upon the age of the student at issue to resolve the special relationship analysis. Rather, we have said that schools do not have a special relationship with students because "[p]arents remain the primary source for the basic needs of their children." *Hillsboro*, 113 F.3d at 1415. This is as much true for elementary students as it is for high school students. No matter the age of the child, parents are the primary providers of food, clothing, shelter, medical care, and reasonable safety for their minor children. Thus, school children are returned to their parents' care at the end of each day, and are able to seek assistance from their families on a daily basis, unlike those who are incarcerated or involuntarily committed.

---

[5] The Does (and our dissenting colleagues) contort a statement made by the Supreme Court in a wholly different context in *Ingraham v. Wright*, 430 U.S. 651 (1977), into a suggestion that the Court would find a special relationship in this case. Addressing claims brought by a group of students alleging that corporal punishment in public schools was prohibited by the Eighth Amendment, the Court stated that "[t]he schoolchild has little need for the protections of the Eighth Amendment" because "the public school remains an open institution," and "[e]xcept perhaps when very young, [a] child is not physically restrained from leaving school during school hours." *Id.* at 670. The Court then listed a number of reasons why schools are open institutions. Yet the Court did not suggest that a public school is no less an open institution if a student is restrained from freely leaving the school due to her young age or if a student is apart from teachers or other students, whether on campus or off. Indeed, in an opinion written far more recently than *Ingraham*, the Court explicitly stated in dicta that its opinions should not be read to "suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995) (citing *DeShaney*, 489 U.S. at 200).

No. 09-60406

Jane's immaturity is insufficient to distinguish this case from our decisions in *Walton* and *Hillsboro*. The suggestion that we ought to examine an individual's characteristics to determine whether the state has assumed a duty to care for that person is wholly unsupported by precedent. The situations in which the state assumes a duty of care sufficient to create a special relationship are strictly enumerated and the restrictions of each situation are identical. In the circumstances of incarceration, involuntary institutionalization, and foster care, the state has, through an established set of laws and procedures, rendered the person in its care completely unable to provide for his or her basic needs and it assumes a duty to provide for these needs. Neither the Supreme Court nor this court has ever suggested that anything less than such a total restriction is sufficient to create a special relationship with the state, regardless of the age or competence of the individual. *See DeShaney*, 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.").

Moreover, the focus upon Jane's young age makes an essentially arbitrary distinction between the thirteen- and fourteen-year-old students in *Walton* and *Hillsboro* and nine-year-old students like Jane. If we were to accept this argument, schools would be required to evaluate the maturity of each student to determine whether the school has a special relationship with that student. Indeed, some students could "age out" of constitutional protection over the course of one academic year. A constitutional duty to protect a student from harm does not depend on the maturity of the student, a factor not in the control of the state. Through their public school systems, states take on the responsibility of educating students, but, no matter the age of the student, public schools simply do not take on the responsibility of providing "food, clothing, shelter, medical

14

care, and reasonable safety" for the students they educate. *See DeShaney*, 489 U.S. at 200.

Particularly instructive on this question is the Ninth Circuit's recent decision in *Patel v. Kent School District*, 648 F.3d 965 (9th Cir. 2011). There, a developmentally disabled student had several sexual encounters with a classmate in a restroom adjacent to her classroom. *Id.* at 968. The student's parents had requested that she remain under adult supervision at all times because her disability prevented her from recognizing dangerous situations and caused her to act inappropriately with others. *Id.* at 968-70. Nevertheless, the student's teacher allowed her to use the restroom alone in order to foster her development. *Id.* at 969. The Ninth Circuit held that compulsory school attendance laws do not create a special relationship between public schools and students that would require schools to protect the students from harm. *Id.* at 973-74. Of particular import to this case, the Ninth Circuit also rejected the student's contention that the school was required to protect against her "special vulnerabilities." *Id.* at 974. The court reasoned that "[i]n the case of a minor child, custody does not exist until the state has so restrained the child's liberty that the parents cannot care for the child's basic needs," and the student's disability did not prevent her parents from caring for her basic needs. *Id.* (citing *DeShaney*, 489 U.S. at 199-201). Under the Ninth Circuit's reasoning, the existence of a special relationship does not depend on the characteristics of the individual. Consistent with *Patel*, we conclude that Jane's young age and immaturity do not provide a basis for finding a special relationship with her school.

Our conclusion that no special relationship exists between nine-year-old Jane and her school is consistent with the decisions of our sister circuits, four of which have addressed cases involving children who were approximately the same age or even younger than Jane. *See Allen v. Susquehanna Twp. Sch. Dist.*,

No. 09-60406

233 F. App'x 149, 151-53 (3d Cir. 2007) (finding no special relationship between school and developmentally disabled eleven-year-old student who left school grounds and was subsequently killed); *Worthington v. Elmore Cnty. Bd. of Educ.*, 160 F. App'x 877, 878, 881 (11th Cir. 2005) (finding no special relationship between school and developmentally disabled seven-year-old student who was sexually assaulted by another student on a school bus); *Stevenson*, 3 F. App'x at 30-31 (finding no special relationship between school and ten-year-old boy who had been beaten up repeatedly by bullies during the school day); *Maldonado*, 975 F.2d at 728, 731-33 (finding no special relationship between school and eleven-year-old boy who died of accidental strangulation in an unsupervised cloakroom adjacent to his classroom during the school day). While we should have every reason to expect that public schools can and will provide for the safety of public school students, no matter their age, our precedents, and the decisions of every other circuit to have considered this issue, dictate that schools are simply not *constitutionally* required to ensure students' safety from private actors. Despite her young age, Jane was not attending the school through the "affirmative exercise of [state] power," *DeShaney*, 489 U.S. at 200; she was attending the school because her parents voluntarily chose to send her there (as one of several ways to fulfill their compulsory education obligations), and they remained responsible for her basic needs.[6]

---

[6] Although it is true that Jane's guardians were less able to protect Jane during the school day, this fact exists to some extent in every alleged special relationship case involving injuries that occurred at school. *See, e.g.*, *Patel*, 648 F.3d at 969-70; *Hasenfus*, 175 F.3d at 70-71; *Middle Bucks*, 972 F.2d at 1366; *Maldonado*, 975 F.2d at 728, 732-33; *see also Stevenson*, 3 F. App'x at 27-28. This fact has never been found to create a special relationship, as the parents remain the primary caregivers, and the child can turn to his or her parents for help on a daily basis. *See Middle Bucks*, 972 F.2d at 1372 ("D.R.'s complaint alleges an ongoing series of assaults and abuse over a period of months. Although these acts allegedly took place during the school day, D.R. could, and did, leave the school building every day. The state did nothing to restrict her liberty after school hours and thus did not deny her meaningful access to sources of help.").

No. 09-60406

b.    *Compulsory School Attendance Laws*

The Does also suggest that a special relationship exists because Jane's attendance at school was mandated by compulsory attendance laws. We have specifically held, however, that compulsory school attendance laws do not "alone create a special relationship." *Hillsboro Indep. Sch. Dist.*, 113 F.3d at 1415.

There is no indication that Jane's attendance at the school was somehow more compulsory as a nine-year-old than if she were a teenager. While it may be true that elementary school students are subject to more rules during the school day (a fact not pleaded), their attendance at school is no more or less mandatory than teenagers' attendance. In fact, Jane was subject to exactly the same Mississippi compulsory education laws as was the plaintiff in *Walton*, who voluntarily attended a residential school for the deaf. Mississippi requires parents to enroll their children in school until age seventeen, and parents may fulfill this requirement in several ways, only one of which is to send their child to public school. MISS. CODE ANN. § 37-13-91(3) (requiring that parent enroll compulsory school-age child in a public school, a "legitimate nonpublic school," or provide a "legitimate home instruction program"). It may well be true that, for the vast majority of parents in Mississippi, the only way for them to fulfill their obligation is to enroll their children in public school. But that practicality does not alter the fact that Jane's parents voluntarily sent her to the school as a means of fulfilling their obligation to educate her. Jane's parents were free at any time to remove Jane from the school if they felt that her safety was being compromised. This reality is a far cry from the situation of incarcerated prisoners, institutionalized mental health patients, or children placed in foster care. Mississippi's compulsory education law is therefore insufficient under our precedent to create a special relationship between the school and Jane, despite Jane's young age.

No. 09-60406

c.    *Release of Jane to Keyes*

As a final effort to distinguish this case from the many others in this area, the Does contend that the "active, deliberately indifferent, conduct" of school officials in releasing Jane to Keyes formed a special relationship. The dissent similarly argues that a special relationship was created when the school separated Jane from her teachers and classmates and delivered her into Keyes' exclusive custody. This argument, however, has several flaws.

Even assuming that the school had custody over Jane to the exclusion of her legal guardians, which it did not, the school did not *knowingly* transfer that custody to an unauthorized individual. The complaint alleges that the school employee releasing Jane committed an affirmative act, but does not assert that the school employee actually knew that Keyes was unauthorized to take Jane from school. Implicit in the Supreme Court's holding that a state may create a special relationship through an "affirmative exercise of its power," *DeShaney*, 489 U.S. at 200, is the requirement that the state actor know that he or she is restricting an individual's liberty. When a state incarcerates a prisoner, institutionalizes a mental health patient, or places a child in foster care, the state knows that it has restricted the individual's liberty and rendered him unable to care for his basic human needs. When a school employee carelessly fails to ensure that an adult is authorized to take an elementary student from the school, no state actor has knowledge that the school has thereby restricted the student's liberty, because the adult taking the student from school may or may not be authorized.

The Does' (and the dissent's) theory also suggests that the same act that creates the special relationship can also violate the duty of care owed to the student. Under the special relationship exception, the state assumes a duty to care for and protect an individual. Once the special relationship is created, it is the failure to fulfill that duty that gives rise to a constitutional violation. An

18

allegation of deliberate indifference may be sufficient to *violate* a constitutional duty, but it is not sufficient to *create* the constitutional duty. Furthermore, this theory suggests that the school's very act of *releasing* Jane into the custody of a private actor somehow created the state custody that is necessary for a *DeShaney* special relationship to exist in the first place. Such a theory is wholly inconsistent with *DeShaney* itself. 489 U.S. at 199-200 ("[W]hen the State takes a person *into its custody* and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.") (emphasis added).

The Tenth Circuit in *Graham v. Independent School District No. I-89*, 22 F.3d 991 (10th Cir. 1994), rejected an argument similar to the one the Does raise here. In that case, Graham brought suit under Section 1983 against a school district after certain students shot and killed her son on school property during the school day.[7] Graham alleged that the school knew that her child was in danger of being harmed, but failed to take appropriate protective measures. *Id.* at 993. The plaintiffs argued that the school's "knowledge of the violent propensities of one of its students . . . coupled with the quasi-custodial nature of school attendance, satisfies the standards articulated in *DeShaney*." *Id.* at 994. The court rejected this argument, holding that "foreseeability cannot create an affirmative duty to protect when plaintiff remains unable to allege a custodial relationship." *Id.* The court concluded:

> [i]naction by the state in the face of a known danger is not enough to trigger the obligation; according to *DeShaney* the state must have limited in some way the liberty of a citizen to act on his own behalf. In the absence of a custodial relationship, we believe plaintiffs cannot state a constitutional claim based upon the defendants' alleged knowledge of dangerous circumstances.

---

[7] The appeal was considered jointly with another suit, which was brought by the mother of a student who was stabbed on school premises. *Graham*, 22 F.3d at 993.

No. 09-60406

*Id.* at 995 (citation and internal quotation marks omitted). Thus, the state's failure to protect the student from private harm (even if foreseeable) did not give rise to a constitutional claim in the absence of a finding that a custodial relationship already existed.

The Does point us to no distinguishing characteristics of this case that are sufficient to give rise to a *DeShaney* special relationship between Jane and her school. This case is ultimately no different than *Walton* and *Hillsboro*, and thus requires the same outcome.

4.    *Conclusion*

The question posed to us is whether Jane's school, through its affirmative exercise of state power, assumed a *constitutional* duty to protect Jane from a private actor. We are compelled by our precedent, and by the Supreme Court's guidance in *DeShaney*, to conclude that the school did not assume that duty. The district court correctly held that the Does have failed to state a claim under § 1983 for a constitutional violation under the special relationship exception.

Because we find no special relationship, we do not address whether the school's alleged actions in releasing Jane to Keyes amounted to "deliberate indifference." As this en banc court previously explained in *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002), only where a state first creates a special relationship with an individual does the state then have "a constitutional duty to protect that individual from dangers, including, in certain circumstances, private violence." *Id.* at 324; *see also Walton*, 44 F.3d at 1300-01 (explaining that if a state creates a special relationship with an individual, it will then owe "some duty—arising under the Due Process Clause of the Fourteenth Amendment to the United States Constitution—to protect [the individual's] bodily integrity from third party non-state actors."). Without a special relationship, the school had no constitutional duty to protect Jane from private actors such as Keyes, and the question of its alleged deliberate indifference is simply immaterial.

20

No. 09-60406

Having concluded that the school had no special relationship with Jane that imposed on the school a constitutional duty to protect her from private harm, we now turn to the Does' remaining theories of liability.

## B.    State-Created Danger

The Does argue that they have stated a viable constitutional claim under the so-called "state-created" danger theory of liability. We find no such viable claim.

After *DeShaney*, many circuits[8] used the following language in the Court's opinion to provide an alternative basis for § 1983 liability for harm inflicted by private actors:

> While the State may have been aware of the dangers that Joshua faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them*. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, *it placed him in no worse position than that in which he would have been had it not acted at all* . . . .

*DeShaney*, 489 U.S. at 201 (emphases added). Under the state-created danger theory, a state actor may be liable under § 1983 if the state actor created or knew of a dangerous situation and affirmatively placed the plaintiff in that situation. *See, e.g., Carlton v. Cleburne Cnty.*, 93 F.3d 505, 508 (8th Cir. 1996) ("In [the state-created danger] cases the courts have uniformly held that state actors may be liable if they affirmatively created the plaintiffs' peril or acted to render them more vulnerable to danger. In other words, the individuals would not have been in harm's way but for the government's affirmative actions.") (citation omitted). In *Wood v. Ostrander*, 879 F.2d 583, 586 (9th Cir. 1989), the

---

[8] *See, e.g.*, *Lombardi v. Whitman*, 485 F.3d 73, 80 (2d Cir. 2007); *Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066-67 (6th Cir. 1998); *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011); *Carlton v. Cleburne Cnty.*, 93 F.3d 505, 508 (8th Cir. 1996); *Wood v. Ostrander*, 879 F.2d 583, 589-90 (9th Cir. 1989); *Uhlrig v. Harder*, 64 F.3d 567, 572-73 (10th Cir. 1995).

No. 09-60406

Ninth Circuit adopted the state-created danger theory in the context of a § 1983 claim brought against police officers by the passenger of an impounded vehicle, who was raped after officers abandoned her on the side of a road in a high crime area in the early morning hours. *Id.* at 586, 588-90. Similarly, in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), the Third Circuit adopted the state-created danger theory in the context of a lawsuit brought against a city and several police officers on behalf of a woman who suffered extensive brain damage when the officers allegedly sent her home "unescorted in a seriously intoxicated state in cold weather." *Id.* at 1208-09.[9]

Unlike many of our sister circuits, we have never explicitly adopted the state-created danger theory. *See, e.g., McClendon*, 305 F.3d at 325. The district court in this case acknowledged our precedent, but held that even if the theory were recognized, the Does had failed to plead facts that would amount to a constitutional violation. The court held that the Does did not contend that the Education Defendants knew that their policy would allow Jane to be checked out of school by an unauthorized adult and sexually assaulted; therefore, the Does had not alleged that the Defendants were deliberately indifferent to a known danger.

---

[9] Our sister circuits have since set out various multi-factor tests related to the state-created danger theory. The Seventh Circuit, for example, has developed a three-part test. *See Jackson*, 653 F.3d at 654 ("To establish a substantive due process claim under a state-created danger theory, [the plaintiff] must demonstrate that: (1) the district, by its affirmative acts, created or increased a danger that [the plaintiff] faced; (2) the district's failure to protect [the plaintiff] from danger was the proximate cause of her injuries; and (3) the district's failure to protect her 'shocks the conscience.'"). The Sixth Circuit has laid out a similar three-factor test. *See Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 763 (6th Cir. 2010) ("A state-created danger claim has three elements: (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.").

No. 09-60406

The Does contend that this circuit has in fact adopted and applied the state-created danger theory in light of our decisions in *Scanlan v. Texas A&M University*, 343 F.3d 533 (5th Cir. 2003), and *Breen v. Texas A&M University*, 485 F.3d 325 (5th Cir. 2007), which arose out of the 1999 bonfire collapse at Texas A&M University. In *Scanlan*, the panel considered the allegations and stated that the "district court should have concluded that the plaintiffs stated a section 1983 claim under the state-created danger theory." 343 F.3d at 538. Despite this statement, subsequent panels have concluded that *Scanlan* did not in fact adopt the state-created danger theory. In *Rivera v. Houston Independent School District*, 349 F.3d 244 (5th Cir. 2003), for example, we explained that while *Scanlan* remanded the "case to the district court for further proceedings, [it] did not recognize the state created danger theory." *Id.* at 249 n.5; *see also Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 422-23 (5th Cir. 2006) ("*[N]owhere* in the [*Scanlan*] opinion does the court expressly purport to adopt or approve th[e] [state-created danger] theory."). This understanding was complicated somewhat by our decision in *Breen*, where a panel of this court again interpreted *Scanlan*. 485 F.3d at 336. The *Breen* panel concluded that "[t]he *Scanlan* panel's clearly implied recognition of state-created danger as a valid legal theory applicable to the case is the law of the case with respect to these further appeals in these same cases now before this panel." *Id.* The panel, however, subsequently withdrew this portion of the opinion. *Breen v. Texas A&M Univ.*, 494 F.3d 516, 518 (5th Cir. 2007). Despite the potential confusion created by *Scanlan* and *Breen*, recent decisions have consistently confirmed that "[t]he Fifth Circuit has not adopted the 'state-created danger' theory of liability." *Kovacic v. Villarreal*, 628 F.3d 209, 214 (5th Cir. 2010); *see also Bustos v. Martini Club, Inc.*, 599 F.3d 458, 466 (5th Cir. 2010) ("[T]his circuit has not adopted the state-created danger theory.").

No. 09-60406

We decline to use this en banc opportunity to adopt the state-created danger theory in this case because the allegations would not support such a theory. Although we have not recognized the theory, we have stated the elements that such a cause of action would require. The *Scanlan* panel explained that the state-created danger theory requires "a plaintiff [to] show [1] the defendants used their authority to create a dangerous environment for the plaintiff and [2] that the defendants acted with deliberate indifference to the plight of the plaintiff." *Scanlan*, 343 F.3d at 537-38. To establish deliberate indifference for purposes of state-created danger, the plaintiff must show that "[t]he environment created by the state actors must be dangerous; they must know it is dangerous; and . . . they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur." *Piotrowski v. City of Houston*, 237 F.3d 567, 585 (5th Cir. 2001) (citation and internal quotation marks omitted); *see also McClendon*, 305 F.3d at 326 n.8 ("To act with deliberate indifference, a state actor must know of and disregard an excessive risk to the victim's health or safety.") (internal quotation marks and alterations omitted). Critically, this court has explained that the "state-created danger theory is inapposite without a known victim." *Rios*, 444 F.3d at 424 (citation and internal quotation marks omitted); *see also Lester v. City of Coll. Station*, 103 F. App'x 814, 815-16 (5th Cir. 2004) ("[E]ven if it is assumed that the state-created-danger theory applies, liability exists only if the state actor is aware of an *immediate danger facing a known victim*.") (citing *Saenz v. Heldenfels Bros., Inc.*, 183 F.3d 389, 392 (5th Cir. 1999)) (emphasis added).

In support of their state-created danger claim, the Does allege that school officials "received complaints and inquiries and/or had internal discussions and safety meetings concerning checkout policies and procedures and access to students under their care and control by unauthorized individuals," and they therefore "had actual knowledge of the dangers created by their policies, customs

24

and regulations, but they failed to take corrective action to reduce or prevent the danger." According to the Does, the school's failure to adopt a stricter policy amounted to "deliberate indifference." Nevertheless, the Does' allegations cannot make out a state-created danger claim, as they do not demonstrate the existence of "an immediate danger facing a known victim." *Saenz*, 183 F.3d at 392. At most, the Does allege that the school was aware of some general deficiencies in the check-out policy. They do *not* allege that the school knew about an immediate danger to Jane's safety, nor can the court infer such knowledge from the pleadings. Without such allegations, even if we were to embrace the state-created danger theory, the claim would necessarily fail.

We have consistently cautioned against finding liability under the state-created danger theory based upon an ineffective policy or practice in cases where the plaintiff's injury is inflicted by a private actor. In *Rivera v. Houston Independent School District*, for example, we rejected a state-created danger claim against a school after a student died as a result of gang-related violence, and explained:

> [T]o hold HISD responsible for the ultimate ineffectiveness of [its policies designed to combat gang violence] would turn the Due Process Clause's limited duty of care and protection into a guarantee of shelter from private violence. This result would be inimical to the Supreme Court's conclusion [in *DeShaney*] that the Due Process Clause does not require the State to protect individuals from private violence.

349 F.3d at 250; *see also Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997) (finding no viable state-created danger claim in case where student was raped by a school custodian with no known criminal history, and explaining that a "post hoc attribution of known danger would turn inside out this limited exception to the principle of no duty"). We conclude that the Does' allegations do not support a claim under the state-created danger theory, even if that theory were viable in this circuit.

No. 09-60406

## C.    Municipal Liability

Finally, the Does maintain that they have stated a viable claim under what they describe as a "pure" municipal liability theory. They argue that municipal liability is available under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), because the school promulgated a policy—the ineffective student check-out policy—that was the moving force behind Jane's injury. We disagree.[10]

A claim of municipal liability under Section 1983 "requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski*, 237 F.3d at 578 (citing *Monell*, 436 U.S. at 694).[11] We have stated time and again that "[w]ithout an underlying constitutional violation, an essential element of municipal liability is missing." *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997); *see also Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992) ("[P]roper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."). Thus, even if the ineffective check-out policy was the moving force

---

[10] The Does also contend that the district court erred in applying a heightened pleading standard to their municipal liability claim, in violation of *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993). That contention fails. Fairly read, the district court applied the *Twombly* and *Iqbal* standards in this case.

[11] We have, of course, recognized that § 1983 municipal liability can also exist if "[t]he official policy itself [is] unconstitutional." *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009); *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) ("For a municipality to be liable on account of its policy, the plaintiff must show, among other things, either (1) that the policy *itself* violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers 'with "deliberate indifference" as to its known or obvious consequences . . . .'") (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997)). Jane's claim, however, rests upon deliberate indifference, and she does not allege that the school's policy *itself* violates the constitution.

26

No. 09-60406

behind Jane's injury, there can be no § 1983 liability unless Jane suffered a constitutional violation. Jane did not suffer a constitutional violation at the hands of Keyes because Keyes is not a state actor. The only state actions that could give rise to a constitutional violation in this case are the school's failure to prevent Keyes from injuring Jane or the act of releasing Jane to Keyes. As explained above, these state actions are insufficient for purposes of the special relationship and state-created danger theories. The Does now contend that they have alleged a constitutional violation because the school's conduct shocks the conscience.

The Supreme Court recognized the shocks the conscience standard in *Rochin v. California*, 342 U.S. 165 (1952). There, the Court found a violation of Rochin's substantive due process rights after police officers who had arrested Rochin ordered doctors to pump Rochin's stomach to induce him to vomit two capsules of morphine that he had previously swallowed. *Id.* at 166. The Court determined that the state's conduct "shock[ed] the conscience," and therefore violated Rochin's due process rights. *Id.* at 172. Later, in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the Supreme Court explained that substantive due process is violated by executive action "only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Id.* at 847 (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992)). The *Lewis* Court found that a police officer's deliberate indifference during a high-speed chase that caused the death of a motorcyclist did not "shock the conscience," but left open the possibility that unauthorized law enforcement behavior in other contexts might "shock the conscience" and give rise to § 1983 liability. *Id.* at 836-37, 850, 854; *see Chavez v. Martinez*, 538 U.S. 760, 774 (2003).

Conduct sufficient to shock the conscience for substantive due process purposes has been described in several different ways. It has been described as

27

conduct that "violates the decencies of civilized conduct"; conduct that is "so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency"; conduct that "interferes with rights implicit in the concept of ordered liberty"; and conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 846-47 & n.8 (citation and internal quotation marks omitted). Many cases that have applied the standard have involved the use of extreme force by police officers or other state actors. *See Checki v. Webb*, 785 F.2d 534, 535-36, 538 (5th Cir. 1986) (state trooper intentionally used his vehicle to terrorize motorist and passenger); *Shillingford v. Holmes*, 634 F.2d 263, 264-65 (5th Cir. 1981) (police officer intentionally struck tourist because he was photographing the police officer and fellow officers apprehending a boy on the street during a Mardi Gras parade), *abrogated on other grounds by Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir. 1993); *see also Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1071, 1075-76 (11th Cir. 2000) (student blinded in one eye when a coach intentionally hit him in the head with a metal weight); *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 797 (8th Cir. 1998) (rape of a woman at her house by a police officer after he stopped her for a traffic violation); *Hemphill v. Schott*, 141 F.3d 412, 418-19 (2d Cir. 1998) (police officer provided assistance to a third party in shooting the plaintiff). As one court has recently summarized, "[t]he burden to show state conduct that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations resulting from bad faith to something more egregious and more extreme." *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010) (citation and internal quotation marks omitted).

We find that the Does' attempt to employ the shocks the conscience standard is unsuccessful for two reasons. First, the only state action at issue here is the adoption and implementation of an allegedly deficient policy, which

No. 09-60406

allowed school employees to release Jane to Keyes without verifying his identification or his right to take Jane from the school. We conclude that the implementation and execution of such a policy does not, on its own, shock the conscience, particularly when compared to those cases detailed above in which that standard has been successfully applied. *See, e.g., Checki*, 785 F.2d at 538; *Shillingford*, 634 F.2d at 265. The policy simply does not fall within the category of conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. Far from a policy that shocks the conscience, the check-out policy at issue here appears to be relatively common and to have some logical basis, particularly in small communities such as Covington County, Mississippi.[12] The mere fact that Keyes exploited the check-out system to gain access to Jane does not mean that the school's adoption and implementation of the policy shocks the conscience.

Second, we must be careful not to read the *Rochin* shocks the conscience standard as a separate exception to the *DeShaney* principle. The actual harm inflicted upon Jane in this case was caused by private actor Tommy Keyes, and after *DeShaney*, the state cannot be held constitutionally liable for its "failure to protect an individual against private violence," save for the special relationship theory and, in some circuits, the state-created danger theory. *DeShaney*, 489 U.S. at 197. To allow the Does to proceed on a shocks the conscience theory without first demonstrating a constitutional duty to protect would be wholly inconsistent with *DeShaney*. In fact, the *DeShaney* Court itself

---

[12] Amici curiae the National School Boards Association, the Texas Association of School Boards Legal Assistance Fund, and the Mississippi School Boards Association argue, "a [check out] policy that allows for the exercise of professional judgment and discretion is not inherently dangerous . . . . In some communities, particularly those with small campus enrollments, school personnel often know parents, grandparents, babysitters, and other visitors by sight." They further maintain that "[a]n ironclad rule precluding any exercise of discretion would prevent the release of children to parents and guardians who have lost or forgotten their identification . . . , and it would prevent the release of children in circumstances in which the legal guardian is unavailable . . . ." We need not address those arguments.

29

No. 09-60406

rejected a similar argument. There, the petitioners had argued that a special relationship existed between the state and young Joshua DeShaney, such that the state had a duty to protect him from his father's violence. *Id.* The state's failure to discharge that duty, the petitioners argued, was an "abuse of governmental power that so 'shocks the conscience,' as to constitute a substantive due process violation." *Id.* (citing *Rochin*, 342 U.S. at 172). The Court rejected this argument because it concluded that no special relationship existed between Joshua DeShaney and the state. *Id.* at 198.

As we conclude that the school's adoption and implementation of its check-out policy does not *itself* shock the conscience, a constitutional claim on this basis necessarily fails. Moreover, as we have found that Jane has not alleged an underlying constitutional violation (under either the special relationship theory or the purported state-created danger theory), there is no other potential basis for municipal liability. *Becerra*, 105 F.3d at 1048 ("Without an underlying constitutional violation, an essential element of municipal liability is missing."). We therefore reject the Does' municipal liability argument.[13]

## D.    Qualified Immunity

The district court held in the alternative that, even if the Does had stated a constitutional claim, the Education Defendants sued in their individual capacities were entitled to qualified immunity, because any right to governmental protection based upon a special relationship between Jane and her school was not clearly established at the time that Jane was victimized.

---

[13] The Does also attempt to impose supervisory liability on a failure to train or supervise theory. Nevertheless, this theory still requires the violation of an underlying constitutional right, which is lacking here. *See City of Canton v. Harris*, 489 U.S. 378, 386-90 (1989); *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 254 (5th Cir. 2005) ("[S]upervisors may be liable for constitutional violations committed by subordinate employees when supervisors act, or fail to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates.") (emphasis omitted); *see also Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("[T]here can be no liability under *Monell* for failure to train when there is no violation of the plaintiff's constitutional rights.").

No. 09-60406

Although no longer mandated as a first step in the qualified immunity analysis, one part of this analysis requires us to "decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). Because we determine that the Does have failed to state a violation of Jane's constitutional rights, we need not further consider the qualified immunity analysis.[14]

## IV. CONCLUSION

In affirming the dismissal of the Does' complaint, we do not suggest that schools have no obligation to insure that their students remain safe from acts of private violence. State law provides the appropriate legal framework to address Jane's injury. The question we have addressed is simply whether the school's failure to check Keyes's identity and be certain that he was authorized to take Jane amounted to a *constitutional* violation. Supreme Court precedent, our precedent, and the decisions of every other circuit to address the special relationship exception compel this court to conclude that it does not. In addition, neither the state-created danger theory nor municipal liability provides a viable basis for recovery.

For these reasons, the judgment of the district court is AFFIRMED.

---

[14] Upon dismissal of the Does' constitutional claim, the district court also declined to exercise supplemental jurisdiction over their remaining state law claims, and dismissed those claims without prejudice, consistent with 28 U.S.C. § 1367(c)(3). The Does do not appeal this dismissal.

31

No. 09-60406

E. GRADY JOLLY, Circuit Judge, specially concurring:

I fully concur with the thorough and comprehensive opinion of Judge King. I specially concur, however, to underline the stubborn fact that the issue of whether a special relationship can be created between a school and its students has been before the en banc court three times and three times we have said the same thing. As this en banc court makes clear, the other two en banc cases, *Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995) (en banc), and *Doe v. Hillsboro Independent School District*, 113 F.3d 1412 (5th Cir. 1997) (en banc), were not only fully consistent with one another– and their authority undiminished before this en banc court occurred–but now the combined authority of all three en banc cases affirms and makes unambiguous the rule of this court to be: We "strictly" construe *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 199-200 (1989), to hold that, "only when the state, by its affirmative exercise of power, has custody over an individual *involuntarily or against his will*, does a 'special relationship' exist between the individual and the state." *Walton*, 44 F.3d at 1303 (emphasis in original). *Walton* and *Hillsboro* are not just clear, they are emphatically clear that a special relationship under *DeShaney* "only arises" between the state and an individual when the individual "is involuntarily confined or otherwise restrained against his will pursuant to a governmental order or by the affirmative exercise of state power"; it "does not arise solely because the state exercises custodial control over an individual." *Id.* at 1299. When a person claiming the right of state protection is voluntarily within the care or custody of a state agency, such as a schoolchild who voluntarily subjects himself or herself "to the rules and supervision of [ ] School officials," any "willful relinquishment of a small fraction of liberty simply is *not comparable* to that measure of almost *total deprivation* experienced by a prisoner or involuntarily committed mental patient." *Id.* at 1305 (emphasis added). Expanding state liability for the acts of private persons can make

32

constitutional sense only if the state has "effectively taken the plaintiff's liberty under terms that provide no realistic means of voluntarily terminating the state's custody *and* which thus deprives the plaintiff of the ability or opportunity to provide for his own care and safety." *Id.* (emphasis in original). There is no room–not an inch–for confusion. The law yesterday and today is bare and bald: No *DeShaney* special relationship exists between a public school and its students. Absent a special relationship, any analysis of the defendant's conduct as deliberately indifferent to the rights of the student is, under *DeShaney*, irrelevant.

No further panel of this court should require us to iterate these clear statements of the law a fourth time.

No. 09-60406

HIGGINSON, Circuit Judge, concurring in the judgment:

Dicta in *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989), has contributed to twenty-three years of circuit (and intra-circuit) disharmony, and excited legions of law review articles, about whether the Constitution asserts positive or negative liberties, or regulates government action or inaction—all giving uncertain guidance to litigants and courts, as well as public officials, hence necessarily also giving uncertain relief to citizens whom government persons cause to be subjected to injury.

In this case, a plaintiff-father and his minor child Jane Doe ("Jane"), and others, complain that Jane was injured when unknown government actors (designated "EDUCATION DEFENDANTS A-Z"), among others, released her from public elementary school to an adult male ("Tommy Keyes"), who bore no relation to her and was not listed on her check-out form, who then raped her and returned her each time to school.

The district court dismissed this complaint as one that fails to state a legally cognizable claim. Our court today affirms that dismissal based on extensive, but nearly exclusive, discussion of the "special relationship" extra-statutory theory of liability adverted to by the Supreme Court in *DeShaney*. Although I agree that the enlargement of liability beyond Section 1983's literal requirements contemplated by the "special relationship" test is not a basis for liability in this case, I write separately to redirect inquiry back to Congress's exact language.

Section 1983 has a pedigree older than the harms it was found not to cover in *DeShaney*. Passed in 1871, Section 1983 reads:

> Every person who, under color of [law] . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

34

42 U.S.C. §1983.

Set against this statutory language, the instant complaint makes a conclusory, and I ultimately conclude not facially cognizable, claim. Plaintiffs do not complain that government persons subjected Jane to rape, but they come close to complaining that government persons *caused her to be subjected* to rape. If the complaint had asserted that the affirmative act of releasing Jane to Keyes was a causal act of recklessness or deliberate indifference or intentionality that caused her to be subjected to injury, and specifically to the deprivation of her right to bodily integrity, the complaint properly would proceed through discovery to trial.

The Supreme Court considered similar challenged government action in *Martinez v. California*, 444 U.S. 277 (1980), nine years before *DeShaney*. In *Martinez*, the Court assessed a complaint filed against parole officials who had released a parolee who, five months later, tortured and killed a child. The Court explained that, "[a]lthough the decision to release Thomas from prison was action by the State, the action of Thomas five months later cannot be fairly characterized as state action" depriving the decedent of her right to life protected by the Fourteenth Amendment. *Id.* at 284-85. The Court further elaborated that:

> We need not and do not decide that a parole officer could never be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole. But we do hold that at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' [release] action to hold them responsible under the federal civil rights law.

*Id.* at 285. Jane was raped on numerous school days, each time after she was released to her assailant, whereafter he returned her to complete her school day. On the day of Keyes' final rape, January 8, 2008, Jane was released despite the

fact that to check her out of school Keyes allegedly "stated that *he* was the minor's *mother*" (emphasis added).

It may well be that a jury would conclude that an assault on the same day as a government release is too remote for causal attribution, if not in time then in location or circumstance. And a jury might always conclude that no more than negligent conduct was present, however tragic. *See Davidson v. Cannon*, 474 U.S. 344, 347 (1986). But if a jury, not us, were to come to such conclusions, then we, as government persons, are not immunizing other government persons, here state public school officials, against accountability for their affirmative act of releasing Jane from school under whatever complicating, aggravating, or mitigating release circumstances might be developed through discovery and at trial. This assignment of decision-making responsibility to assess, check, or overlook government action as a cause-in-fact of an injury, and specifically a deprivation of a constitutionally protected right, is consistent with the choice made by electors who, through Congress in 1871, established that a cause of action exists when a government officer "causes to be subjected" a person to a "deprivation of any right[] . . . secured by the Constitution . . . ."

To the extent that our court contemplates this "causes to be subjected" statutory language before turning to *DeShaney*, it is in a footnote reference to our decision in *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443 (5th Cir. 1994) (en banc), which recognized a constitutional right to bodily integrity "vouchsafed by the Fourteenth Amendment" against state action. The court today infers from that important truism that "*Taylor* is inapplicable here because the *actual violation* of Jane's bodily integrity was caused by Keyes, a non-state actor" (emphasis added). But that conclusion substitutes this court for a jury in deciding one of three inter-related elements of Section 1983: (1) state action, as

No. 09-60406

(2) the cause-in-fact of (3) a deprivation of right protected by the Constitution.[1] The conclusion also either constricts the statute—and government accountability for wrongdoing—from cases where a government person causes a victim "to be subjected" to a violation, just to cases where the government person "subjects" the victim to the actual violation, or constricts even more by rewriting the statute to make liable only government persons who actually "depriv[e]" others of rights secured by the Constitution.

Section 1983, as well as its historical moment and purpose, and as implied by the Supreme Court in *Martinez*, does not perceive only a divisible and binary world of government or non-government rights violations. Instead, these difficult cases arise often out of a grey zone where a government person's alleged recklessness or deliberate indifference or intentionality is inextricably intertwined with a not-remote injury allegedly inflicted by a third person, the first (government person) causing the citizen to be subjected to injury by the second (non-government) assailant. *See, e.g.*, *Wood v. Ostrander*, 879 F.2d 583, 589-90 (9th Cir. 1989) (holding that a Section 1983 claim was triable when police arrested driver and impounded vehicle, leaving passenger alone in a high crime area at 2:30 a.m. who then was raped); *Reed v. Gardner*, 986 F.2d 1122, 1126-27 (7th Cir. 1993) (holding that a Section 1983 claim was triable when police arrested and removed driver but left drunk passenger with keys who then drove off and killed and injured individuals in another car in a head-on collision).

---

[1] In any Section 1983 complaint, the challenged conduct must be conduct taken under color of state law because, as the Supreme Court held in *United States v. Cruikshank*, 92 U.S. 542, 544 (1885), when purely private conduct causes injury, the Fourteenth Amendment is not implicated. Here, therefore, what is challenged is the government's conduct releasing Jane. Whether that government conduct is too remote from the child's injury, in turn, is the statutory question of causation which, under *Martinez*, I contend can and should generally be resolved by a jury, *see Johnson v. Greer*, 477 F.2d 101, 105-08 (5th Cir. 1973), with the *DeShaney* proviso that government inaction—a failure to protect—may alone be actionable, hence causal pursuant to Section 1983, in the unique context of government-ordered custody.

No. 09-60406

I do not think that this court would argue, for example, that an intentional and knowing release by a government person to a self-proclaimed rapist would immunize the releaser from liability simply because the violation physically was inflicted by another.  Perhaps there even would be little disagreement about permitting a Section 1983 complaint to proceed to discovery and trial if the complaint alleged that Keyes had had a no-contact order excluding him from Jane's "check-out list," coupled with a school policy that mandated identity verification against that check-out list, yet a government person intentionally or recklessly or with deliberate indifference still released Jane to Keyes who immediately raped her.

I write separately, therefore, to affirm and clarify that citizens gain the protection that they have given themselves, through Congress, against government persons who cause them to be subjected to deprivations which the Constitution and laws disallow.  Section 1983 was passed in a time when this was a real and specific threat.  Today, these "silver platter" or grey zone cases thankfully are rare, yet government persons, intentionally or recklessly or through deliberate indifference, must know they will be held blameful if they cause a citizen to be subjected to a rights deprivation even if the "actual violation" is inflicted by a third person, as would be true if, for example, a sheriff released a prisoner to a vengeful lynch mob.

To the extent that this statutory validation has added constitutional importance, beyond checking government wrongdoing, it is that it assigns to jury resolution difficult grey zone questions about state action and causality when the challenged government conduct combines in time and circumstance with third party activity to cause a constitutional injury.  *See Johnson v. Greer*, 477 F.2d at 105-08; *Anderson v. Nosser*, 456 F.2d 835, 841 (5th Cir. 1972) (en banc).

I do not mean to imply that *DeShaney*'s "special relationship" theory has no relevance.  I ultimately conclude, concurring with the court, that the thrust

38

No. 09-60406

of the plaintiffs' complaint alleges that the depriving act was the government's "failure to protect" Jane because of its discretionary identification check-out policy. To that extent, I agree that compulsory education laws did not force Jane into a custodial setting with Keyes so that her injury is attributable to school persons because of their policy failure to better protect children being released from school. The Supreme Court implied such extra-statutory, all-encompassing "special relationship" liability when the challenged government conduct is inactivity—so untethered by Section 1983's cause-in-fact element—only in the unique, double-confining setting of government-controlled custody which gives opportunity to aggressor-inmates and denies opportunities for self-defense to inmate-victims. Whereas post-*DeShaney* "special relationship" doctrine reads into the Fourteenth Amendment, at least for purposes of Section 1983 liability, a duty of protection when government-ordered custody makes self-help impractical or impossible, looking only at the victim and the victim's relationship to the government invites anguishing comparisons between whether a foster child is more or less helpless than a schoolchild, *see Griffith v. Johnston*, 899 F.2d 1427, 1439 (5th Cir. 1990) (extending "special relationship" theory of liability to placement of children in foster care), as well as unanswerable questions of moral duty and the perils of indifference. It may well be that nine-year-old Jane, like Joshua DeShaney, was no less helpless than an adult prison inmate, but for Section 1983 to make actionable government inaction, under the *DeShaney* "special relationship" theory, liability should attach only when the government has complete physical control of victims *and* their aggressors, as in prison, but unlike in schools or foster home circumstances.

The literal language approach, if persuasive to others, might also tighten *DeShaney* helpfully in a second sense. Every other court of appeals to have considered the issue, except us, has embraced the expanded claim of liability termed "state-created danger," which also derives from dicta in *DeShaney*. We

39

have avoided this second judicial enlargement of liability presumably because its loose articulation (shielding persons from "perils" and "vulnerabilities" and "harm's way" said to be "created by" government action), like the "special relationship" theory, also was not the result of the lawmaking process. Moreover, the existence of this ill-defined notion of government liability has provided a leaky bucket for the grey zone cases that properly should go to a jury as to state action and causation without any extra-statutory gloss which courts conjure. *See* Maj. Op. at 22 n.9 (listing complexity of "various multi-factor tests related to the state created danger theory"). Indeed, our court in this case highlights, in part, the confusion, stating, alternatively, that, "[w]e decline to use this en banc opportunity to adopt the state-created danger theory in this case because the allegations would not support such a theory." The court goes on to write that, "we have stated the elements that such a cause of action would require," and then quotes a medley of non-statutory "factors," that include, but are not limited to, government creation of "'a dangerous environment,'" government "'deliberate indifference to the plight of the plaintiff,'" a "'third party's crime,'" a known and disregarded "'excessive risk to the victim's health or safety,'" and government "'aware[ness] of an immediate danger facing a known victim.'" The instant allegations then are said not to "support such a theory." It is unsurprising that no Section 1983 litigant in this circuit ever has been able to support such a theory.

To summarize, Section 1983 should be construed literally. Literal application of Section 1983 would narrow only to government custody the *DeShaney* "special relationship" theory of actionable inaction, as explicitly stated by the late Chief Justice Rehnquist, and literal application of Section 1983 would reduce only to statutory elements the amorphous "state-created danger" theory we have not endorsed. At the same time, literal application of Section 1983 would (1) acknowledge that the statute protects not just against government

No. 09-60406

persons who subject citizens to a constitutional deprivation but also against government persons who cause citizens to be subjected to such deprivations; (2) avoid government persons (courts) from immunizing other government persons (state or local officials) from liability for wrongdoing which electors, through Congress, have made actionable and which non-government persons (jurors) should resolve; and (3) would apply Section 1983's syntax to comprehend the rare but tragic set of grey zone cases where government persons, intentionally or recklessly or through deliberate indifference, cause, consistent with *Martinez*, a victim to be subjected by a third person to a rights deprivation.

Having made the above statutory observation—urging narrowed liability on extra-statutory theories emanating from dicta in *DeShaney*, but recognizing liability for government persons who non-negligently cause in time and circumstance citizens to be subjected to constitutional injury actually inflicted by others—I nonetheless conclude that the instant complaint, put alongside the plain language of Section 1983, is not congruent enough to survive summary dismissal. Instead of setting forth a facially plausible charge of government recklessness or indifference or intentionality in the release of Jane that caused her to be subjected to her injury, the complaint's preliminary statement (paragraph 1), statement of facts (paragraphs 2-7), and above all its "[b]ut for" allegation in its "action for deprivation of civil rights" (paragraphs 20-25), focus exclusively on the opposite, namely the education defendants' alleged policy of inaction, giving school officials who check out children discretion to verify or not to verify the identification of receiving adults. That contention describes liability non-causally, which is the extra-statutory theory of liability recognized by the Supreme Court to apply only in custodial settings.

For the above reasons, I concur in the judgment of the court.

41

No. 09-60406

WIENER, Circuit Judge, joined by DENNIS, Circuit Judge, dissenting.

Like the law of nature, the law of man recognizes no more basic or extensive "special relationship" than that between parents and their "very young" children. Central to that relationship is the parents' exclusive right to the custody of their children and the concomitant duty to protect them. It must follow that when a state mandates that parents delegate the custody of their child to a state agency, subdivision, or municipality, such total delegation creates a special relationship between the delegatee and the child in its custody—at least when such child is "very young"—and imposes on such custodial state delegatee a duty to protect that child from violations of her constitutional rights. I am convinced that the parents' custodial delegatee here— the Covington County Elementary School ("the School")—cannot be permitted to evade its duty to protect its very young pupils while they are in its exclusive custody.

As is apparent from the Does' *Iqbal*/*Twombley*-compliant[1] complaint and the majority opinion, this case involves repeated decisions and acts by the School's officials to temporarily sub-delegate its exclusive custody of a nine-year-old fourth-grade girl, in the middle of six different school days, over a span of four months, to an unidentified adult, who was not authorized under the School's express policy to check her out, and whose identity it did not even attempt to verify. On each of those six occasions, that adult, Tommy Keyes, proceeded to brutally rape the little girl, Jane Doe, and then return her to the custody of the School—still during the course of the school day. This was no isolated or anecdotal incident, and the School's officials allegedly contributed to its recurrence by failing, each time, to verify Keyes's identity and his lack of authorization.

---

[1] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

No. 09-60406

Despite our standard of review of dismissal of actions at their initial (Rule 12(b)(6)) stage, the majority raises the stakes of this appeal by not limiting its analysis to the Does' complaint, but instead asserting categorically that public schools have no *DeShaney* special relationship[2] with, and thus no constitutional duty to protect, any schoolchildren–not even the very young–from non-state actors. Thus, I address (1) whether a public school can *ever* have a constitutional duty to protect any subset of children in its care, (2) whether the Does adequately pleaded facts that would support such a duty, and (3) whether School officials violated that duty through their deliberate indifference to Jane's constitutional rights. Ultimately, I answer these questions in the affirmative. Assuming, as we must at this initial, pleadings stage of the proceedings, that the factual allegations of the Does' complaint are correct, I conclude that the School's actions constitute a serious derogation of the State's constitutional duty to protect a helpless individual while in its exclusive custody and care. Because I remain convinced that the majority's conclusion that the State had no such constitutional duty is contrary to both law and common sense, I respectfully but strenuously dissent.

## I. SPECIAL RELATIONSHIP

The substantive component of the Due Process Clause of the Fourteenth Amendment protects individuals from state action that "shocks the conscience."[3] Although substantive Due Process does not generally protect individuals from private actors, the Supreme Court stated in *DeShaney* that there is an exception,

---

[2] *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 199-200 (1989).

[3] *Rochin v. California*, 342 U.S. 165, 172 (1952).

No. 09-60406

and that the State does owe an individual a duty of protection when a special relationship exists between the State and the individual:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. . . .  The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and *reasonable safety*—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.[4]

In this case, Jane attended a public elementary school in Mississippi, where attendance is compulsory[5] and where all the relevant events took place during the school day, not at its end.[6]  None disputes that more than compulsory public education is required to establish a special relationship between the State and a student, but this does not justify taking the leap of logic needed to reach the conclusion that a special relationship can *never* exist in the public school setting.  When, in *Doe v. Hillsboro Independent School District*, we held that *alone* compulsory attendance does not create a special relationship between a state and a presumably pubescent, thirteen-year-old middle-school student, we

---

[4] *DeShaney*, 489 U.S. at 199-200 (citation omitted; emphasis added).

[5] *See* Miss. Code Ann. § 37-13-91(3) (school attendance generally compulsory for children between the ages of six and seventeen).

[6] *Contra Doe v. Hillsboro Indep. School Dist.*, 113 F.3d 1412, 1414 (5th Cir. 1997) (no special relationship when student was raped after school hours).

No. 09-60406

quoted the following general explanation from the Supreme Court's decision in *Ingraham v. Wright* as to why public schools are distinguishable from, e.g., prisons and mental institutions:

> Though attendance may not always be voluntary, the public school remains an open institution. *Except perhaps when very young*, the child is not physically restrained from leaving school during school hours; and *at the end of the school day*, the child is invariably free to return home. Even while at school, the child brings with him the support of family and friends and is *rarely apart* from teachers and other pupils who may witness and protest any instances of mistreatment.[7]

*Ingraham*'s latent exception for the "very young" public school attendee is finally before us, in the Does' complaint, for the first time.

The majority attempts to distinguish *Ingraham* based on that case's concern with the application of the Eighth Amendment to corporal punishment in public schools, but our decision in *Hillsboro* expressly recognized the obvious relevance of *Ingraham*'s analysis to the special relationship inquiry. Compounding the majority opinion's error in making this purported distinction, it strangely declares that the Supreme Court's reasoning does "not suggest that a public school is no less an open institution if a student is restrained from freely leaving the school due to her young age or if a student is apart from teachers or

---

[7] 113 F.3d 1412, 1415 (5th Cir. 1997) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (emphasis added)).

45

No. 09-60406

other students, whether on campus or off."[8]  In fact, though, that is precisely what the Supreme Court's analysis suggests.

Specifically, the *Ingraham* exception can only mean that there may very well be a special relationship between a public school and a student who (1) is "very young," (2) is "physically restrained" by (and unable to leave freely) the school's custody, and (3) is isolated or kept "apart from teachers and other pupils who may witness and protest any instances of mistreatment"–as is precisely alleged here.  Rather than superficially distinguishing what the Supreme Court has said–even in dicta–we should apply it, as I shall now attempt to do.

## A.    Jane Was of Such a Very Young Age That She Could Not Protect Herself

When Jane was repeatedly checked out of school and brutally raped, she was a very young, pre-pubescent, nine-year-old, fourth-grade girl.  The majority refuses to acknowledge the obvious: that the degree of control exercised by a de jure and de facto custodian over very young children is necessarily much greater and more pervasive than over post-puberty teenagers or adults.  The majority does not even acknowledge that the Does might be able to establish as much if given the opportunity to adduce evidence, especially expert reports and testimony.  But expert testimony is not required to know that very young children like Jane are virtually never capable of protesting or challenging adult authority figures, particularly those whose authority is apparently endorsed by the very persons or institutions that such children trust.[9]  Neither are such

---

[8]  *See supra*, En Banc Majority Opinion at 13, note 5.

[9]  *See A. v. Laredo Indep. School Dist.*, No. 5:05-cv-237, 2007 WL 189458, at *4 (S.D.Tex. Jan. 22, 2007) ("The notion that a seven year-old child can be expected to assert his

No. 09-60406

youngsters generally able to recognize and respond to subtle threats to their safety, which is the prime reason why they, unlike older students, are never permitted to leave school grounds by themselves. The defendants in this case do not assert that the School had a unique policy of allowing very young, fourth-grade students to come and go without restraint; indeed, the School's adoption of a formal check-out policy confirms that just the opposite is true. Add to this truism the two-step factual allegations of the Does' complaint that Jane was *first* taken from her class (and thus separated from the very teacher and classmates who, under *Ingraham*, were her support) and, *second*, turned over to Keyes outside the ken of these putative supporters, and the flaw in the majority's logic becomes all the more apparent. In such isolation, a very young child like Jane could hardly have stood up for herself in light of the actions taken by School officials.

Under the majority's analysis, the age of the schoolchild is categorically irrelevant to the special relationship inquiry: "No matter the age of the child, parents are the primary providers of food, clothing, shelter, medical care, and reasonable safety for their minor children"; and children return home at the end of each school day.[10] But neither the majority nor any decision it cites explains how or why parents' care of children *before and after* the school day can or should preclude the existence of a special relationship *during* school hours.[11]

---

liberties in the face of institutional authority is questionable to say the least. . . . One may intuitively conclude that this reality gives rise to a commensurate supervisory duty to protect the child's basic physical safety.").

[10] *See supra*, En Banc Majority Opinion at 13.

[11] *See D.R. by L.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, 1379 (3rd Cir. 1992) (Sloviter, C.J., dissenting) ("*DeShaney* contains no language to support the . . . holding that the duty to protect can be triggered only by involuntary, round-the-clock, legal custody."); *see also id.* at 1381 ("prisoners are probably much more articulate about their complaints about mistreatment than are school children, particularly when the treatment

No. 09-60406

Although Jane's parents were presumably able to provide her with food, clothing, and protection before she left home in the morning and after she returned home at the end of each school day, this in no way enabled them to provide for her safety–reasonable or otherwise–throughout the course of the school day. Albeit in dicta, now-Chief Judge Jones exposed the fallacy of holding otherwise in *Johnson v. Dallas Independent School District*, which involved a shooting committed by a non-student, non-state actor on the school grounds:

> The argument against holding that public schools have "custody," at least for some purposes of protecting their physical well-being, appears to derive less from logic than from a pragmatic desire to limit their legal liability. As has been shown, students must attend school and may not leave without permission. To say that student attendance is voluntary because parents may elect to home-school their children or send them to a private school is lamentably, for most parents, a myth. *See D.R. v. Middle Bucks,* [972 F.2d 1364, 1380 (3d Cir. 1992) (Sloviter, C.J., dissenting)]. To intimate that parents retain effective responsibility for their children's well-being when the school alone makes critical decisions regarding student safety and discipline is inaccurate. To suggest that parents somehow are in a better position than the schools to protect their children from the ravages of weapons smuggled onto campus during the school day is cruelly irrational. To hope that students who are unarmed can protect themselves from the depredation of armed criminals in their midst is ridiculous. That parents yield so much of their children's care into the hands of public school officials may

consists, as in this case, of sexual abuse").

No. 09-60406

well be argued to place upon the officials an obligation to protect students at least from certain kinds of foreseeably dangerous harm during regular school hours.[12]

This reasoning is all the more powerful when, as here, the schoolchild who suffers injury to her bodily integrity is "very young." To contend that it is primarily up to parents to prevent public schools from handing off their nine-year-old girls to unknown men during the course of the school day would be outrageous. Yet the majority's emphasis on parents' responsibility for their children's needs, including safety from sexual predation, if not wholly irrelevant, can have no other meaning. At the same time, the majority never addresses just what it is that Jane's parents conceivably could have done, or should have done, to safeguard her in this situation. Even if it could somehow be imagined that the parents bear some responsibility, such a conclusion cannot be drawn from the Does' pleadings without the benefit of discovery.

The majority also suggests that the distinction between very young children and older children is "essentially arbitrary."[13] But, far from being arbitrary, distinguishing between pre-pubescent and pubescent or post-pubescent children is not just natural and intuitive–it is grounded in extensive science.[14] This distinction, which is based on biology and is reflected in the differentiation between elementary school and junior high school, has

---

[12]  38 F.3d 198, 203 n.7 (5th Cir. 1994).

[13]  *See supra*, En Banc Majority Opinion at 14.

[14]  *See* Theresa O'Lonergan & John J. Zodrow, *Pediatric Assent: Subject Protection Issues Among Adolescent Females Enrolled in Research*, 34 J.L. MED. & ETHICS 451, 454 (2006) ("Sexual development is the morphologically recognizable hallmark of adolescence. Of particular interest here is the bald fact that adolescent girls can conceive and bear children.").

No. 09-60406

historically been considered important by the medical profession and society at large.[15]  In addressing numerous areas, Congress and state legislatures have treated pre-pubescent and post-pubescent children differently and have used age as a proxy for that distinction.[16]  The particular *age* selected might appear to be arbitrary (though it could have been informed by expert analysis had this case been allowed to proceed), but not the distinction.  A distinction with such deep biological and historical roots, and which remains vital in many legal realms, can hardly be considered "arbitrary."

The majority also contends that it would be impractical to assess every individual's characteristics to determine whether a special relationship exists.

---

[15]  *See id.* at 454-55 (footnotes omitted):

Adolescence is, by definition, a convergence of developmental factors. Historically, the law, religion and society have implicitly applied the "rule of sevens" to assign legal and moral responsibility to children and adolescents. Courts have treated seven-year-olds as capable of distinguishing right from wrong . . . .  Likewise, religions and courts have treated fourteen-year-old adolescents as far more accountable than younger children for their actions and, in many cases, assign culpability. . . . [P]hysicians generally acknowledge that adolescents are differentially equipped to make medical decisions from thirteen years to adulthood. . . . In most states, adolescents may seek and obtain sexual and reproductive health information and services without the permission of or even notification of their parents.

[16]  *See, e.g.*, Fair Labor Standards Act, 29 U.S.C. §§ 201-19 (setting fourteen as the minimum age for most non-agricultural work); *see also* Charles A. Phipps, *Misdirected Reform: On Regulating Consensual Sexual Activity Between Teenagers*, 12 CORNELL J.L. & PUB. POL'Y 373, 429-31 (2003) (footnotes omitted):

Without exception, the law in all fifty states prohibits sexual activity between an adult and a pre-pubertal child. . . . [T]he criminal law treats post-pubescent victims differently from pre-pubescent victims. While post-pubertal minors are still deemed incapable of consenting to sexual activity with adults, the fact that they have reached puberty generally translates into lower criminal penalties for those who engage in sexual activity with victims in this category. Because the age of consent in the majority of states is sixteen, this means that [this type of post-pubertal] victim generally is one aged fourteen or fifteen.

No. 09-60406

Not so: A schoolchild's age is an objective and easily-determined fact. I do not suggest–and we need not decide, in this case–that more subjective factors, such as a specific child's (Jane's) mental acuity or degree of social development, should be a part of the special relationship inquiry.[17] Line-drawing is inevitable in this area, but an approach guided by objective facts does not require line-drawing of unusual difficulty. By contrast, an approach that categorically ignores age–by, for example, ignoring the differences between a nine-year-old grammar school girl and a high school senior twice her age–only heightens the arbitrariness of the line demarcating special relationships. Further, the majority's approach would presumably leave pre-schoolers and even infants in the State's care unprotected–a patently absurd result.

In short, nine-year-old, elementary-school students in general–not just Jane, subjectively–are significantly distinct from teenage, middle- and high-school students in their ability to provide for their own protection from sex offenders when they are mandatorily separated from their legal guardians during the school day. Jane's very young age is thus highly relevant to the existence of a special relationship between herself and the School. This factor need not be sufficient alone, however, because the School also affirmatively exercised its power to restrain Jane's liberty even more strictly, as detailed below.

---

[17] It is worth noting, however, that the Supreme Court has considered such subjective factors in holding that a state's duty to protect an involuntarily committed psychiatric patient extends to "such training as may be reasonable in light of [the patient's] liberty interests in safety and freedom from unreasonable restraints[.]". *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). If individual characteristics were categorically irrelevant, then *Youngberg* would not have defined a state's constitutional duties to institutionalized psychiatric patients any more broadly than its duties to competent adult prisoners.

## B.     The School Affirmatively Forced Jane into Keyes's Sole Custody at School and Allowed Keyes to Take Her Away from the School Where She Could Not Protect Herself

Under the well-pleaded allegations of the Does' complaint, the State had a special relationship with Jane, not just because of her very young age, but also because of the School's decision, while acting *in loco parentis* to the exclusion of all others, and pursuant to its express policies, (1) first, to separate Jane from her teachers and classmates, and (2) only then to deliver her into the exclusive custody of Keyes for the express purpose of his taking her away from the school grounds and later returning her there, all during the course of the school day. This affirmative exercise of state power is significant under the Supreme Court's analysis in *Ingraham*, quoted by this court in *Doe v. Hillsboro Independent School District*. By actively removing Jane from the classroom and then delivering her in isolation into Keyes's custody, the School rendered Jane (1) *entirely* "apart from teachers and other pupils who may witness and protest any instances of mistreatment,"[18] and (2) not "free to return home"[19]–except, exclusively, at Keyes's mercy. This was an affirmative exercise of state power, on six separate occasions, that further disabled Jane and further obliged the State to protect her.

We and other courts have held that a special relationship may exist when a state sub-delegates its delegated custody of an individual to a third party. For

---

[18] *Doe v. Hillsboro Indep. School Dist.*, 113 F.3d at 1415 (quoting *Ingraham*, 430 U.S. at 670).

[19] *Id.*

No. 09-60406

example, a state has a special relationship with a minor it places in foster care,[20] a burglary suspect it temporarily places in the custody of a private club owner,[21] and a woman it threatens with arrest and physically places in her intoxicated boyfriend's truck.[22]  In none of these or other such cases did a state actor physically hold the victim at the time of the injury (had no de facto "custody"), but the victim "was in the defendant officers' custody at the time she was forced into" the third party's control.[23]  The State is therefore considered "a participant in the custody which led to the victim's death [or injury]."[24]  The same reasoning has to apply here.

Moreover, these cases demonstrate that the special relationship doctrine is not inflexibly limited to "24/7" incarceration or institutionalization only. Rather than excluding broad areas of state action, such as public schools, from the reach of the special relationship doctrine, we must be sensitive to the factual

---

[20] *Griffith v. Johnston*, 899 F.2d 1427, 1439 (5th Cir. 1990) (state agency "created a 'special relationship' . . . when it removed [children] from their natural homes and placed them under state supervision.  At that time, [the state agency] assumed the responsibility to provide constitutionally adequate care for these children."); *see also DeShaney*, 489 U.S. at 201 n.9 ("Had the State by the affirmative exercise of its power removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect.").

[21] *Horton v. Flenory*, 889 F.2d 454, 458 (3d Cir. 1989) (state had duty to protect plaintiff when, pursuant to state policies, police officer left plaintiff in custody of club owner, who beat plaintiff to death).

[22] *Stemler v. City of Florence*, 126 F.3d 856, 868-69 (6th Cir. 1997) (state had duty to protect woman who "was rendered unable to protect herself by virtue of both the threat of arrest and her physical placement in the truck by the officers"; woman was then killed when her boyfriend crashed the truck into a guardrail); *see also Davis v. Brady*, 143 F.3d 1021, 1024-26 (6th Cir. 1998) (state had special relationship with intoxicated police-car passenger abandoned on a highway).

[23] *Stemler*, 126 F.3d at 869.

[24] *Horton*, 889 F.2d at 458.

No. 09-60406

context in which a case arises.[25] Here, the relevant context includes the School's affirmative decision to (1) isolate the "very young" Jane from her teachers and classmates and (2) deliver Jane into Keyes's exclusive custody, in those sequential steps rendering Jane and her parents utterly helpless.

In light of their decision to separate Jane from her teacher and classmates and then release her to Keyes, the school officials' role was not merely passive or simply negligent, as the majority asserts. The active nature of the School's role is underscored by the check-out policy in question. That policy admittedly–as the majority opinion states–"*permitted* school employees to release students to individuals,"[26] but, more importantly, *forced Jane, the student* to be released, giving her, as well as her teacher, her classmates, and her parents, no choice in the matter.[27] Only by examining the relationship between Jane and the State–not the relationship (for these purposes irrelevant) between the State officials who set the School's policies and those who implemented

---

[25] *See, e.g.*, *Estate of Lance v. Lewisville Indep. School Dist.*, No. 4:11–CV–00032, 2011 WL 4100960, at *7-8 (E.D.Tex. Aug. 23, 2011), *adopted*, 2011 WL 4101164 (E.D.Tex. Sept. 13, 2011) (engaging in such an analysis and holding that the plaintiff adequately alleged a special relationship when a very young, disabled child was placed in in-school suspension); *Teague ex rel. C.R.T. v. Texas City Indep. School Dist.*, 348 F.Supp.2d 785, 792-93 (S.D.Tex. 2004) (construing special relationship doctrine "in the context of this particular plaintiff" and holding that the plaintiff adequately alleged a special relationship between a public school and a child with Down's Syndrome), *vacated*, 386 F.Supp.2d 893, 896 (S.D. Tex. 2005) (granting summary judgment to defendant when discovery revealed that the victim was in fact 18 years old at the time of the incident, was no longer subject to compulsory attendance, and had the mental capacity of a 13 year-old).

[26] *See supra*, En Banc Majority Opinion at 3.

[27] The complaint does not reveal Jane's reactions to being placed in Keyes's custody. Only discovery or trial evidence could resolve such an issue. In any event, a nine-year-old's possible failure affirmatively to protest being placed in the custody of a grown man, even one who repeatedly raped her, surely does not somehow convert that custody from involuntary to voluntary.

No. 09-60406

them–does the question of a special relationship in this case come into proper focus.

The majority also reasons that the School's temporary delegation of its exclusive custody of Jane to Keyes does not support the existence of a special relationship because the School did not "*knowingly* transfer that custody to an unauthorized individual."[28] A state-knowledge requirement, the majority continues, is "implicit" in the principle that a special relationship may be created only through an "affirmative exercise" of state power.[29] But such a state-knowledge requirement–for which the majority cites no precedent–would not imply that, for there to be a special relationship, the state must know *all* the circumstances, i.e., each and every discrete fact, surrounding its custody of an individual.[30] As alleged here, the School clearly did affirmatively exercise its powers by separating Jane from her teachers and classmates and delivering her to Keyes, and it did so pursuant to its express policies. School personnel were perfectly aware that they were undertaking these actions–affirmatively, not passively.

It is technically true that the School did not "know" Keyes to be unauthorized, but all it had to do was (1) verify Keyes's identity, and (2) follow its own express policy by viewing Jane's check-out form. Although the School's

---

[28] *See supra*, En Banc Majority Opinion at 17.

[29] *DeShaney,* 489 U.S. at 200 ("when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs— e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause").

[30] For example, if a state inadvertently imprisons the wrong person, it still owes a duty to protect the person it actually did imprison. The state's error in this regard does not immunize it from the constitutional consequences of its known, affirmative exercise of power–imprisoning the individual.

self-inflicted lack of knowledge could arguably indicate that it was not deliberately indifferent to Jane's safety, that has nothing to do with the special relationship inquiry. For example, a state has a special relationship with and a concomitant duty to protect a prisoner even if the prisoner is injured because of an unknown or unexpected danger to which the official could not have shown deliberate indifference.[31] To conclude, however, that such a prisoner was never in a special relationship to begin with would be illogical. The same is true in this case. My point: the majority has conflated the special relationship and deliberate indifference inquiries.

Curiously, the majority goes on to assert that it is the Does who have conflated these questions, stating that, under the Does' theory, the "same act" both creates the special relationship and demonstrates the State's deliberate indifference.[32] Although it is true, as the majority notes, that the creation of a special relationship does not itself demonstrate deliberate indifference, the Does have never made such a claim. Rather, they allege (1) the special relationship in this case was created when the School placed Jane, a nine-year-old student at a compulsory-attendance public school, in the exclusive custody of Keyes during school hours; and (2) the School officials' deliberate indifference consisted of their failure to verify Keyes's identity or his authority to check Jane out of school. *And, what could constitute indifference more deliberate than checking Jane out to a man who asserts that he is her mother?* It is only natural that the

---

[31] For example, in *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991), we held that a state was not deliberately indifferent to a prisoner's serious medical needs when it allegedly failed to recognize the purported danger of forcing the prisoner to stand in line for meals. The state's lack of knowledge about this risk, however, did not imply that the state never had a duty to protect the prisoner at all.

[32] *See supra*, En Banc Majority Opinion at 18.

No. 09-60406

facts underlying the special relationship and those underlying the State's deliberate indifference are related, but those facts are nonetheless distinct.[33]

The majority also asserts that the School's act of releasing Jane into Keyes's custody cannot demonstrate the kind of state custody that is required for a special relationship to exist. This argument ignores the cases discussed above, however, which teach that a special relationship survives a state's delegation of its exclusive custody to a third party.[34]

Further, the majority's Wonderland-esque analysis of this point implies that, by removing Jane from her classroom and releasing her to Keyes for a portion of the school day, the School *secured* rather than *restrained* Jane's liberty. Really? In fact and in logic, just the opposite is true. By first isolating her and then delegating its exclusive custody of Jane to Keyes, the School (1) deprived Jane of any potential assistance of teachers and classmates, (2) left Jane helpless against Keyes's assault, and (3) eliminated any ability that Jane's parents had to protect her from danger by removing her from the School.[35] Even though Jane's parents presumably had the general ability to remove her from the School (at least for limited periods of time), neither they nor her teachers nor her fellow pupils had any ability to remove her or otherwise protect her once the

---

[33] Even if some of the same facts are relevant to both the special relationship and deliberate indifference inquiries, that does not mean that these prongs are somehow conflated under the Does' theory. *See Stemler*, 126 F.3d at 867 (describing these as "distinct, though interrelated inquiries"). For example, suppose that a state places a prisoner in an unreasonably unsafe prison–a clear 42 U.S.C. § 1983 claim under a special relationship theory. That placement, it could be argued, underlies both the special relationship and the state's putative deliberate indifference to the prisoner's reasonable safety. Yet none could deny that this scenario presents an actionable constitutional claim.

[34] *See Stemler*, 126 F.3d at 869, *Griffith*, 899 F.2d at 1439; *Horton*, 889 F.2d at 458.

[35] Even assuming *arguendo* that the School's duty to protect Jane would have been ceased had it released her to an authorized individual, that is not what happened in this case.

57

School took her from their presence and delivered her into Keyes's custody. At this crucial juncture, the majority appears to reason that any special relationship there could ever have been between Jane and the School abruptly ceased. But what is the use of the special relationship doctrine and its protection of helpless individuals in the State's custody, "if it is in effect an umbrella which is taken away as soon as it begins to rain?"[36]

The majority concludes that it is "compelled" to rule that there is no special relationship in this case.[37] Although we have rejected the special relationship theory in most school situations, we have never foreclosed the application of that theory in "extreme circumstances."[38] Neither have we ever held that characteristics such as very young age are categorically irrelevant to the special relationship inquiry. Indeed, it is for the express reason of Jane's very young age that the School's acts in separating her from teachers and classmates during school hours and delivering her to Keyes caused Jane and her parents to have "no realistic means of voluntarily terminating the state's custody" and no "ability or opportunity to provide for [her] own care and safety."[39] I remain convinced that, under the Does' allegations, the State had a constitutional duty to protect Jane.

---

[36] Abba Eban, Statement to the United Nations Security Council (June 6, 1967), *available at* http://www.mfa.gov.il/MFA/Foreign+Relations/Israels+Foreign+Relations +since+1947/1947-1974/19+Statement+to+the+Security+Council+by+Foreign+Mi.htm.

[37] *See supra*, En Banc Majority Opinion at 19.

[38] *Walton v. Alexander*, 44 F.3d 1297, 1305 (5th Cir. 1995) (finding no special relationship when student voluntarily attended state school for the deaf).

[39] *Id.*

No. 09-60406

## II. DELIBERATE INDIFFERENCE

A state does not violate its substantive due process duty to protect an individual pursuant to a special relationship when it merely acts negligently. Such a violation occurs when the state acts with "deliberate indifference" to that individual's health or safety.[40]  Thus, in addition to alleging that a special relationship existed between Jane and the School, the Does needed to allege adequately that the School officials acted, at the very least, with deliberate indifference.  "To act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety."[41]  Even though the majority does not reach this issue, any objective reading of the Does' complaint confirms that they have quite adequately pleaded that the State acted with deliberate indifference to Jane's safety.

The Does allege with specificity that the School adopted and implemented a flawed check-out policy despite its knowledge that the specific policy thus adopted posed excessive risks to students.  In particular, the Does allege that the School's check-out policy included a "Permission to Check-Out" form for each student which listed by name the only adults authorized to check out that student during the school day.  The Does also allege that (1) the policy did not direct School officials to verify the identity of an adult requesting to check out a student, and (2) the School failed adequately to train and supervise the cognizant officials in the proper administration of the check-out policy.  The Does further allege that these "customs and practices guaranteed that verification would not be checked which created an unreasonable danger to the minor child named herein."  Thus, when Keyes checked Jane out on multiple occasions as

---

[40] *Hernandez ex rel. Hernandez v. Texas Dept. of Protective and Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004).

[41] *Id.*

59

her "father" (and, on at least one occasion, as her "mother"), School officials neither (1) verified Keyes's identity, nor (2) referred to Jane's check-out form, on which Keyes was not listed as an individual authorized to take custody of Jane.[42]

Importantly, the Does' pleadings expressly state that the School's officials were well aware of the risks that their flawed policies engendered, alleging that:

> Upon information and belief, the Education Defendants received complaints and inquiries and/or had internal discussions and safety meetings concerning checkout policies and procedures and access to students under their care and control by unauthorized individuals. The complaints, inquiries, discussions, and/or meetings show that the Education Defendants had actual knowledge of the dangers created by their policies, customs, and regulations, but they failed to take corrective action to reduce or prevent the danger.

These discrete allegations are sufficient to state a claim that School officials acted with deliberate indifference to a known risk to Jane's safety.

True, the Does do not allege that School officials knew that Keyes, in particular, was dangerous. But, "this court has never required state officials to be warned of a specific danger."[43] Indeed, state officials may be deliberately indifferent even if they do not know which particular individual poses the safety risk, or which potential victim will ultimately be injured.[44] An official is

---

[42] Had this case been allowed to proceed, the defendants would have remained free to raise any independent reasons that the School's officials might have had to believe that Keyes was authorized to check out Jane or did not pose a danger to her.

[43] *Hernandez*, 380 F.3d at 881.

[44] *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) ("Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely

No. 09-60406

deliberately indifferent if he knows of and disregards "a substantial risk of serious harm."[45] And it is such awareness that the Does precisely allege.

The defendants' awareness of this risk to student safety is eminently plausible in light of (1) the alleged complaints, inquiries, discussions, and meetings among the defendants on the subject of unauthorized individuals' access to students; (2) the School's allowing Keyes to check out Jane on at least six occasions, including one occasion when he signed her out as her *mother*, which these officials had to have known was bogus; and (3) the general awareness by schools and school boards–heightened in recent years–of the threat posed in the elementary school setting by deviant adults to young children.[46]

With regard to the last point, we learned in a recent appeal of a nationwide program employing an electronic tracking system to identify whether visitors to primary and secondary schools were registered sex offenders or otherwise presented threats to young students.[47] By 2006, the school year immediately preceding the one at issue here, this program had been endorsed by the U.S. Department of Justice, had received federal grant money, and had already been activated in at least 1,400 schools in some 100 school districts

---

to be assaulted by the specific prisoner who eventually committed the assault."); *Curry v. Scott*, 249 F.3d 493, 507 (6th Cir. 2001) ("'actual knowledge' does not require that a prison official know a prisoner would, with certainty, be harmed, or that a particular prisoner would be harmed in a certain way"); *see also Rosa H. v. San Elizario Indep. School Dist.*, 106 F.3d 648, 659 (5th Cir. 1997) (for "actual notice" purposes, "[s]tudents need not show that the district knew that a particular teacher would abuse a particular student").

[45] *Farmer*, 511 U.S. at 837.

[46] This threat is arguably heightened in the middle of the school day, when–unlike at the end of the school day–an unauthorized adult seeking to take custody of a child will presumably not be confronted with the child's actual parent or guardian.

[47] *Meadows v. Lake Travis Indep. Sch. Dist.*, 397 F. App'x 1 (5th Cir. 2010) (unpublished).

No. 09-60406

across ten states. In light of the ubiquitous awareness by schools of the threat posed by deviant adults preying on very young schoolchildren, it is certainly "plausible," and indeed highly likely, that the School knew that it was playing with fire. Of course, nothing more than plausibility is required at this stage of the proceedings.[48]

Despite their alleged awareness of the risk, School officials nevertheless checked Jane out to a man whose identity and authority they never bothered to verify. These allegations are sufficient, at least at this initial motion-to-dismiss stage, to state an actionable constitutional claim grounded in deliberate indifference.

## III. CONCLUSION

Any case involving the rape of a child is, of course, a terrible one, so why is this case so shocking? Part of the special horror of this case is the appalling way in which Jane's parents' state-mandated trust in public school officials for the care and safety of their very young child was rewarded. In a case such as this, in which the alleged actions of state officials "shock the conscience,"[49] the proper remedy is not merely to compensate the victim in tort, but, additionally, to compensate all of us with a constitutional remedy under 42 U.S.C. § 1983, which is intended "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."[50]

---

[48] *Twombly*, 550 U.S. at 570.

[49] *Rochin*, 342 U.S. at 172.

[50] *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

No. 09-60406

As one of our Tenth Circuit colleagues has aptly observed, "[w]e do not adequately discharge our duty to interpret the Constitution by merely describing the facts as 'tragic' and invoking state tort law[.]"[51]  Neither do we adequately discharge our duty by interpreting the special relationship doctrine so narrowly that a helpless nine-year-old girl, abruptly removed from her classroom by school personnel and wrongly delivered to an unauthorized grown man, falls through the mesh of the Constitution's safety net.  The Does have more than adequately alleged discrete facts to show that the State had a constitutional duty to protect Jane and that it failed abysmally in that duty.  These are the reasons why I dissent.

---

[51] *Maldonado v. Josey*, 975 F.2d 727, 735 (10th Cir. 1992) (Seymour, J., concurring).